

**IT IS ORDERED as set forth below:**

**Date: August 9, 2019**

_____
**Paul Baisier**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | : | CASE NO. **19-52577-PMB** |
| | : | |
| **GMI GROUP, INC.,** | : | CHAPTER 11 |
| | : | |
| Debtor. | : | |
| | : | |
| **GMI GROUP, INC.,** | : | |
| | : | ADVERSARY PROCEEDING |
| Plaintiff, | : | |
| | : | NO. **19-5138** |
| v. | : | |
| | : | |
| **UNIQUE FUNDING SOLUTIONS, LLC,** | : | |
| | : | |
| Defendant. | : | |

**ORDER (I) GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO DISMISS AND (II) GRANTING IN PART
AND DENYING IN PART DEBTOR'S MOTION FOR SUMMARY JUDGMENT**

This matter (the "Adversary Proceeding") comes before the Court on the following: (i) a

_Motion to Dismiss Adversary Proceeding, or in the Alternative, Summary Judgment_ (Docket No.

6)(the "UFS Motion") filed by the above-referenced Defendant ("Defendant") on March 26, 2019;

and (ii) a *Cross-Motion for Summary Judgment on Counts I and III, and Response to Defendant's Motion to Dismiss and Motion for Summary Judgment of Adversary Proceeding* (Docket No. 13)(the "<u>Motion for Summary Judgment</u>") filed by the Plaintiff-Debtor (the "<u>Debtor</u>") on April 22, 2019.[1]   The UFS Motion appears to seek both dismissal of the complaint of the Debtor that commenced this Adversary Proceeding (Docket No. 1-1)(the "<u>Complaint</u>") as well as summary judgment as to all of the counts asserted in the Complaint.   Further, the UFS Motion requests a judgment in Defendant's favor in the amount of $136,967.62.   For the reasons set forth below, the UFC Motion is granted in part and denied in part, and the Motion for Summary Judgment is granted in part and denied in part.

## BACKGROUND

### I. Pre-Bankruptcy History

The genesis of this Adversary Proceeding is an "Agreement for the Purchase and Sale of Future Receipts" (the "<u>Agreement</u>")(Ex. A, Docket No. 1-2, pp. 1-10) dated October 3, 2018 in which the Debtor agreed to a sale of its future receipts to Defendant in exchange for an immediate cash advance (such an agreement is known generally as a "merchant cash advance agreement"). Pursuant to the Agreement, the Debtor sold $111,750.00 (the "<u>Purchased Amount</u>") of its future

---

[1] The Debtor supplemented its Motion for Summary Judgment with: (i) a *Memorandum of Law Supporting Plaintiff's Cross-Motion for Summary Judgment and Response to Defendant's Motion to Dismiss and Motion for Summary Judgment* (Docket No. 14); (ii) an *Affidavit of Kayla Dang* (Docket No. 15); and (iii) *Plaintiff's Statement of Material Facts in Response to Defendant's Motion to Dismiss Adversary Proceeding, or in the Alternative, Summary Judgment, and in Support of Plaintiff's Cross-Motion for Summary Judgment* (Docket No. 16)(the "<u>Statement of Material Facts</u>").   As of the date of this Order, Defendant has filed no response to the Motion for Summary Judgment or the Statement of Material Facts.   Pursuant the local rules of this Court, failure to file a response to a motion in an adversary proceeding indicates that the respondent does not oppose the relief sought in the motion.   BLR 7007-1(c)("Any party opposing a motion shall file and serve the party's response, responsive memorandum, affidavits, and any other responsive material not later than 14 days after service of the motion, except that the time to respond to a motion for summary judgment shall be 21 days. Failure to file a response shall indicate no opposition to the motion.").   The local rules also provide that failure to respond to a statement of material facts submitted in connection with a motion for summary judgment result in those facts being deemed admitted.   BLR 7056-1(a)(2)("Response should be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement that are not specifically controverted in respondent's statement shall be deemed admitted.").

receipts (the "Future Receipts") to Defendant in exchange for a purchase price of $75,000.00 (the

"Purchase Price").  In exchange for Defendant's payment of the Purchase Price, the Debtor agreed

to allow Defendant to collect the Purchased Amount through daily debits from a specified bank

account of the Debtor in the amount of $1,117.00 (the "Daily Amount"), which is 17 percent (the

"Specified Percentage") of the Debtor's anticipated daily Future Receipts, until the Purchased

Amount is paid in full.  The Debtor's principal, Kayla Dang ("Ms. Dang"), personally guaranteed

the Debtor's performance under the Agreement (the "Guaranty")(Ex. A, Docket No. 1-2, pp. 11-

13).  Defendant was also granted a security interest in the collateral enumerated in the Agreement

and was authorized to file a UCC-1 financing statement evidencing its security interest therein.  *Id*.

at 5.  The filed financing statement is included as Ex. A to Docket No. 1-2 at p. 14.

 The Agreement provides that the transaction is not a loan, but merely a sale of a portion of

the Debtor's future receipts at a discount to Defendant:

> [Debtor] is selling a portion of a future revenue stream to [Defendant] at a discount, not borrowing money from [Defendant].  There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by [Defendant].

*Id*. at 3.  The Agreement further states that Defendant's purchase of the Future Receipts is with the

risk that the Debtor's business may decline, fail, or end up in bankruptcy, and that Defendant

assumes such risk based on the Debtor's representations, warranties, and covenants contained in

the Agreement:

> If Future Receipts are remitted more slowly than [Defendant] may have anticipated or projected because [Debtor's] business has slowed down, or if the full Purchased Amount is never remitted because [Debtor's] business went bankrupt or otherwise ceased operations in the ordinary course of business, and [Debtor] has not breached this Agreement, [Debtor] would not owe anything to [Defendant] and would not be in breach of or default under this Agreement.

*Id.*  The Agreement also allows both parties to reconcile the Daily Amount that Defendant can debit

from the Debtor's bank account to more accurately reflect the Debtor's actual Future Receipts:

> The Initial Daily Amount is intended to represent the Specified Percentage of [Debtor's] daily Future Receipts. For as long as no Event of Default has occurred, once each calendar month, [Debtor] may request that [Defendant] adjust the Daily Amount to more closely reflect the [Debtor's] actual Future Receipts times the Specified Percentage. . . No more often than once a month, [Defendant] may adjust the Daily Amount on a going-forward basis to more closely reflect the [Debtor's] actual Future Receipts times the Specified Percentage. . . After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.

*Id*.

Events of Default, as defined in the Agreement, occur if: (i) the Debtor takes any actions to interfere with Defendant's collection of the Purchased Amount; (ii) the Debtor violates any representations, warranties, or covenants contained in the Agreement; (iii) the Debtor enters into any other form of financing without the written consent of Defendant; (iv) the Debtor interferes with Defendant's access to bank information; (v) the Debtor defaults under any terms or conditions of any other agreements with Defendant; (vi) the Debtor fails to provide timely notice to Defendant resulting in two or more rejected debits attempted by Defendant in any given calendar month; (vii) the Debtor changes the control of its business; (viii) the Debtor becomes subject to any judgment, garnishment, or tax lien after the execution of the Agreement; (ix) the Debtor defaults under any other material agreement or contract; (x) the Debtor fails to maintain twice the amount of the Daily Amount in its bank account at any time during the Agreement. *Id*. at 6.

If an Event of Default occurs, the following remedies apply:

> 16.1 The Specified Percentage shall equal 100%. The full uncollected Purchased Amount plus all fees and charges (including legal fees) due under this Agreement will become due and payable in full immediately.

> 16.2 [Defendant] may enforce the provisions of the Personal Guaranty of Performance against each owner.

4

16.3 [Defendant] may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which [Defendant] shall recover Judgment against [Debtor], [Debtor] shall be liable for all of [Defendant's] costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of [Defendant] under this provision shall be limited as provided in the arbitration provision set forth below.

16.4 This Agreement shall be deemed [Debtor's] Assignment of [Debtor's] Lease of [Debtor's] business premises to [Defendant]. Upon an Event of Default, [Defendant] may exercise its rights under this Assignment of Lease without prior notice to [Debtor].

16.5 [Defendant] may debit [Debtor's] depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on [Debtor's] bank account or otherwise for all sums due to [Defendant].

16.6 [Debtor] shall pay to [Defendant] all reasonable costs associated with the Event of Default and the enforcement of [Defendant's] remedies, including but not limited to court costs and attorneys' fees.

16.7 [Defendant] may exercise and enforce its rights as a secured party under the UCC.

16.8 All rights, powers and remedies of [Defendant] in connection with this Agreement may be exercised at any time by [Defendant] after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

*Id*. at pp. 6-7.

## II. The Adversary Proceeding

The Complaint contains the following counts: (i) Count I for criminal usury under New York law regarding the Agreement ("Count I"); (ii) Count II for unjust enrichment ("Count II"); (iii) Count III for avoidance and recovery of preferential transfers under 11 U.S.C. §§ 547 and 550 ("Count III"); (iv) Count IV for avoidance and recovery of fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(B) and 550 ("Count IV"); (v) Count V for declaratory judgment as to the validity, priority, or extent of security interests ("Count V"); (vi) Count VI for claims issues related a claim

filed by Defendant in the underlying bankruptcy case; and (vii) Count VII for unconscionability ("Count VII").

The Debtor contends in the Complaint that Defendant obtained a confession of judgment against the Debtor on November 16, 2018 in a New York state court (the "Confessed Judgment")(Ex. A, Docket No. 1-2, pp. 15-19).  The Debtor asserts that, in conjunction with executing the Agreement, Ms. Dang executed an affidavit of confession of judgment that was then used by Defendant to obtain the Confessed Judgment.  This affidavit is attached to an Affidavit of Kayla Dang (Docket No. 15)(the "Dang Affidavit") at page five (5).

The Confessed Judgment is in the amount of $136,967.62 and is comprised of the Purchased Amount ($111,750.00) minus payments received ($8,936.00); attorney's fees in the amount of $33,928.62; and miscellaneous fees and costs in the amount of $225.00.  Ex. A, p. 16.  The Debtor contends that, in addition to the $8,936.00 in payments set forth in the Confessed Judgment, it also made additional payments in the amount of $7,819.00, totaling $16,755.00 in payments made under the Agreement.  The Debtor asserts that Defendant attempted to use the Confessed Judgment to initiate garnishment proceedings against the Debtor and Ms. Dang.  The Debtor states that such garnishment proceedings are the proximate cause for this bankruptcy case.

### a. The UFS Motion

In the UFS Motion, Defendant appears to seek both dismissal of the Adversary Proceeding and summary judgment in its favor as to all counts of the Complaint under Federal Rule of Civil Procedure 56, incorporated herein by Federal Rule of Bankruptcy Procedure 7056.  Defendant also requests an affirmative judgment in its favor in the amount of $136,967.62.[2]  The UFS Motion contains a section entitled "Undisputed Material Facts" in which Defendant asserts that, pursuant

---

[2] Because no counterclaim has been asserted by Defendant, such a request is premature and is therefore denied without prejudice.

to the Agreement, the Debtor agreed to operate, maintain, and grow its business in good faith; not to change the designated bank account from which Defendant was debiting the Daily Amount; and to not restrict Defendant's access to the designated bank account.  UFS Motion, p. 2.  Defendant contends that it only collected $16,755.00 of the Purchased Amount, and that the Debtor opened another bank account to which it denied Defendant access.  *Id*.  Defendant further asserts that the Debtor did not make any payments to it during the 90-day period preceding the filing date of this case, and that the Debtor represented to Defendant at the time of the Agreement that it was solvent when it accepted the Purchase Price.  *Id*.

As to Count I for criminal usury, Defendant first contends that New York law applies to the transaction, and that under the laws of that state, only loans can trigger the usury statute.  Defendant goes on to assert that the Agreement between the parties is not loan, and therefore not subject to usury law.  Defendant cites to various New York state court cases involving transactions similar to the Agreement that were found to constitute sales of future receivables and not loans, thereby avoiding the application of New York's usury statute.  Defendant concludes by requesting that this Court deny Debtor's claim of criminal usury pursuant to Count I "as a matter of law" because the Agreement does not constitute a loan.  *Id*. at 6.

With regard to Count II for unjust enrichment, Defendant asserts that no unjust enrichment exists under the Agreement since the Debtor only paid $16,755.00 of the Purchase Price of $75,000.00, such that Defendant "is out $58,245.00."  *Id*.

As to Count III for preference payments, Defendant only states the following: "Unique received no payments in the 90 days preceding the bankruptcy therefore there are no preference payments to recover."  *Id*. at 7.

Defendant argues that, as to Count IV for fraudulent transfers, the Debtor admits in the Complaint that payments to Defendant were made to defraud creditors, such that the Debtor has unclean hands. Additionally, Defendant states that the Debtor committed fraud in executing the Agreement based upon the Debtor's assertion that it was insolvent on the date of the transaction.

Regarding Count V to determine validity, priority or extent of security interests, Defendant merely asserts: "[b]ecause this is not a loan, as set forth above, and GMI has a perfected UCC in the receivables, there is no legal basis for this Court to rule Unique is not secured." *Id*.

As to Count VI for claims issues, Defendant states: "[u]nique has filed a proof of claim so this count is moot. Further, there are no preference payments under New York law, the transaction is not a loan therefore cannot be usurious." *Id*.

With regard to Count VII for unconscionability, Defendant argues that the Debtor has failed to set forth any legal or factual support for the allegations contained in this Count. Rather, Defendant contends that the circumstances surrounding the Agreement indicate that the Debtor acted in bad faith. In support of this contention, Defendant notes that the Debtor has alleged that it was insolvent when it entered into the Agreement. Further, Defendant accuses the Debtor of "immediately switch[ing] bank accounts" after it executed the Agreement and states that the "principals fraudulently transferred their home to a trust." *Id*. at 8. Hence, Defendant contends that the Debtor and Ms. Dang are the unconscionable actors.

In its conclusion, Defendant states that "[b]ecause the pleadings and the evidence show there is no cause of action upon which relief may be granted and there is no genuine issue as to any material fact" it is entitled to "judgment as a matter of law." *Id*. Defendant ends the UFS Motion by requesting this Court to enter "summary and final judgment" against the Debtor.

### b. The Motion for Summary Judgment

In the Motion for Summary Judgment, the Debtor seeks summary judgment as to Count I (criminal usury) and Count III (avoidance and recovery of preferential transfers) of the Complaint. The Debtor also seeks denial of the UFS Motion for failure to adhere to the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Northern District of Georgia (the "BLR").

The Debtor first addresses the UFS Motion to the extent it could be construed as a motion to dismiss for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6), incorporated herein by Federal Rule of Bankruptcy Procedure 7012.  The Debtor notes that Defendant fails to cite to any legal standard in the UFS Motion to support dismissal of the Complaint.  The Debtor further states that it is "at a bit of a loss as to what, exactly, it needs to address and how it has allegedly failed to state a claim upon which relief may be granted when such grounds are not set forth."  Mot. Summ. J., p. 2.  After describing the pleading threshold requirement for a complaint under Rule 12(b)(6), the Debtor asserts that the Complaint satisfies the threshold sufficiency for pleading causes of action upon which relief can be granted and urges the Court to deny the UFS Motion—to the extent it seeks dismissal of the Complaint—for lacking merit.

The Debtor then addresses the UFS Motion to the extent it seeks summary judgment on all counts of the Complaint under Rule 56.  First, the Debtor contends that the UFS Motion should be denied for failing to adhere to the applicable Federal Rules of Bankruptcy Procedure and the BLR. To that end, the Debtor argues that the UFS Motion should be denied for failing to adhere to BLR

7007-1(a)[3] and 7056-1.[4]  The Debtor also asserts that the UFS Motion should be denied for violating Federal Rule of Bankruptcy Procedure 7012(b).

The Debtor then seeks summary judgment in its favor as to Count I for criminal usury and Count III for preference claims under 11 U.S.C. § 547.  The Debtor's substantive arguments as to these claims are discussed more fully below.

## III. Deficiencies in the UFS Motion

The UFS Motion is styled as a motion to dismiss the Adversary Proceeding, or in the alternative, for summary judgment.  Although the UFS Motion is wholly deficient if construed as a motion for summary judgment as set forth *infra*, the Court will construe the UFS Motion as a motion to dismiss under Rule 12(b)(6).

### a. The UFS Motion Cannot be Construed as a Motion for Summary Judgment

If construed as a motion for summary judgment pursuant to Rule 56, the UFS Motion is inadequate.  First, the UFS Motion fails to adhere to the BLR.  As noted by the Debtor in the Motion for Summary Judgment, BLR 7007-1(a) requires that facts contained in motions filed in adversary proceedings that are not otherwise contained in the record be supported by affidavits.  Here, Defendant makes factual allegations that are not otherwise supported by materials currently in the

---

[3] BLR 7007-1(a), which applies in adversary proceedings, provides that "[e]very motion presented to the Bankruptcy Clerk for filing shall be accompanied by a memorandum of law that cites supporting authority. If allegations of fact not otherwise in the record are relied upon, supporting affidavits must be attached to the memorandum of law."

[4] BLR 7056-1(a)(1) and (3) state, in pertinent part:

(1) The movant for summary judgment shall attach to the motion a separate and concise statement of the material facts, numbered separately, as to which the movant contends no genuine issue exists to be tried. Statements in the form of issues or legal conclusions (rather than material facts) will not be considered by the Bankruptcy Court. Affidavits and the introductory portions of briefs do not constitute a statement of material facts.

(3) All documents and other record materials relied upon by a party moving for or opposing a motion for summary judgment shall be clearly identified for the Bankruptcy Court. Where appropriate, dates and specific page numbers shall be given.

record, including but not limited to: (i) that the Debtor opened a different bank account and restricted Defendant's access to such account; (ii) that no payments were made by the Debtor to Defendant within the 90 days prior to February 14, 2019, the petition date of the underlying bankruptcy case (the "Petition Date"); (iii) that the Debtor paid Defendant $16,755.00; (iv) that Defendant is "out $58,245.00"; and (v) that the Debtor's principals fraudulently transferred their residence to a trust. UFS Mot., p. 8. Moreover, Defendant provided no affidavits or other evidence with the UFS Motion to support these allegations.

The UFS Motion also fails to comply with BLR 7056-1(a)(1) and (3), which require (i) that motions for summary judgment contain a separate and concise statement of material facts not in dispute, and (ii) that documents and materials relied upon by a party to a summary judgment motion be clearly identified for the Court. First, Defendant failed to file a separate statement of material facts not in genuine dispute in conjunction with the UFS Motion. *See* Docket, *passim*. Instead, Defendant includes in the UFS Motion a section entitled "Undisputed Material Facts." UFS Mot., p. 1. This is clearly insufficient under BLR 7056-1(a)(1), which states that ". . . the introductory portions of briefs do not constitute a statement of material facts." Accordingly, the UFS Motion lacks any statement of undisputed material facts for the Court to consider.

The UFS Motion also fails to identify any extraneous materials outside of the record upon which Defendant is relying. As noted above, Defendant asserts various "facts" in the UFS Motion that are not part of the record currently before the Court. BLR 7056-1(a)(3) provides that, in moving for or in opposition to summary judgment, any materials or documents relied upon by a party must be clearly identified for the Court. Hence, Defendant's failure to provide any verifiable evidentiary support for various "facts" contained in the UFS Motion—but not part of the record in this case— runs afoul of the requirements of BLR 7056-1(a)(3).

The lack of any extraneous materials included with the UFS Motion outside of those already included in the record in this case also demonstrates the inadequacy of the UFS Motion as a motion for summary judgment.  According to Rule 56(c):

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed.R.Civ.P. 56(c).  A motion for summary judgment generally involves extraneous evidence relevant to the moving party's assertion that no genuine dispute of material facts exists.  10A C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 2713 (4th ed.)(comparing motions to dismiss under Rule 12(b)(6) and Rule 12(c) to motions for summary judgment by noting that "a summary-judgment motion typically is based on the pleadings as well as any affidavits, depositions, and other forms of evidence relevant to the merits of the challenged claim or defense that are available at the time the motion is made.").  Although it is possible to move for summary judgment on the pleadings alone,[5] the UFS Motion contains "factual" allegations that are not part of the record in this Adversary Proceeding, and Defendant has failed to include with the UFS Motion any evidentiary support for such allegations.  The failure of Defendant to include documentary support for assertions in the UFS Motion render such motion deficient if construed as a motion summary

---

[5] Wright & Miller explain that "[o]f course, a summary-judgment motion may be made on the basis of the pleadings alone, and if this is done it functionally is the same as a motion to dismiss for failure to state a claim or for a judgment on the pleadings."  FEDERAL PRACTICE AND PROCEDURE § 2713, *supra* (footnotes omitted).

judgment.  Accordingly, to the extent the UFS Motion seeks summary judgment on the Complaint, it is denied without prejudice.

### b. The UFS Motion will be Construed as a Motion to Dismiss

The UFS Motion, in addition to seeking summary judgment, also seeks dismissal of the Complaint.  Specifically, the portions of the UFS Motion that mention or reference moving to dismiss the Adversary Proceeding are: (i) the heading, entitled "Defendant's Motion to Dismiss Adversary Proceeding, or in the Alternative, Summary Judgment"; (ii) on page four (4) of the UFS Motion in the introductory portion of Defendant's argument as to why the Agreement is not a loan under New York law states that: "[t]he Court should *dismiss the complaint* or grant summary judgment in favor of the Defendant because usury cannot exist where the parties' agreement is not loan." (emphasis added); and (iii) in the "Conclusion" section of the UFS Motion on page eight (8): "[b]ecause the pleadings and the evidence show *there is no cause of action upon which relief may be granted* and there is no genuine issue as to any material fact, Unique is entitled to judgement [sic] as a matter of law." (emphasis added).

It appears from the substantive arguments asserted in the UFS Motion, particularly with regard to Count I, and the posture of this Adversary Proceeding that Defendant is seeking dismissal pursuant to Rule 12(b)(6).[6]  As it is preferable to adjudicate a controversy on its merits, rather than by technical procedural deficiencies (which do not appear to have prejudiced the Debtor), the Court will construe the UFS Motion as a motion to dismiss under Rule 12(b)(6).

---

[6] The basis upon which Defendant seeks dismissal of the Complaint under Rule 12 can only be inferred.  Nowhere in the UFS Motion does Defendant cite to any Federal Rule of Civil Procedure or Federal Rule of Bankruptcy Procedure applicable to dismissing a complaint.

# DISCUSSION

## I. Motion to Dismiss & Summary Judgment Standards

Pursuant to Rule 12(b)(6), dismissal is appropriate if a complaint fails "to state a claim upon which relief can be granted."   Under this standard, "to survive a motion to dismiss, a complaint must now contain factual allegations that are 'enough to raise a right to relief above the speculative level.'"[7]  The factual content alleged must "state a claim to relief that is plausible on its face." *Ashcroft*, *supra*, 556 U.S. at 678, quoting *Twombly*, *supra*, 550 U.S. at 570.  Facial plausibility is shown "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*, quoting *Twombly*, *supra*, at 556.  Although the Court must accept all of the factual allegations in the complaint as true and construe them in the light most favorable to the Debtor, "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts" are not sufficient.  *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1263 (11th Cir. 2004)(citations omitted).  Dismissal is appropriate "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action."  *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)(citations omitted).

Summary judgment may be granted pursuant to Federal Rule of Civil Procedure 56, made applicable herein by Federal Rule of Bankruptcy Procedure 7056, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).[8]  In deciding a motion for summary judgment, the court "is not . . . to

---

[7] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007), quoted in *Berry v. Budget Rent A Car Systems, Inc.*, 497 F.Supp.2d 1361, 1364 (S.D. Fla. 2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010).

[8] In determining the materiality of facts, "the substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91

L.Ed.2d 202 (1986).  A genuine factual dispute exists "if the evidence is such that a reasonable

[factfinder] could return a verdict for the nonmoving party."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 248, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The initial burden of proving the absence of dispute as to any material fact rests with the

moving party.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  In meeting this

initial burden, the moving party must identify "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323, 106 S.Ct.

2548 (internal quotations omitted).  Once the party moving for summary judgment has identified

those materials demonstrating the absence of a genuine issue of material fact, the non-moving party

cannot rest on mere denials or conclusory allegations, but must go beyond the pleadings and

designate, through proper evidence such as by affidavits or personal knowledge or otherwise,

specific facts showing the existence of a genuine issue for trial.  *See* Fed.R.Civ.P. 56(e); *see also*

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89

L.Ed.2d 538 (1986); *Johnson v. Fleet Finance Inc.*, 4 F.3d 946, 948-49 (11th Cir. 1993); *Fitzpatrick*

*v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993).  Further, all reasonable doubts should be

resolved in favor of the non-moving party, and "[i]f reasonable minds could differ on any inferences

arising from undisputed facts, summary judgment should be denied."  *Twiss v. Kury*, 25 F.3d 1551,

1555 (11th Cir. 1994)(citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841

(11th Cir. 1985)).

## II. Count I (Criminal Usury)

As noted *supra*, Count I of the Complaint is for criminal usury under New York law.  In the Complaint, the Debtor asserts that upon finding that the Agreement is a criminally usurious loan, the Agreement must be declared *void ab initio* and, as a penalty, Defendant must sacrifice the principal and interest on the Agreement.  Further, the Debtor asserts that the following relief should be awarded if the Agreement is found to violate New York's criminal usury statute: (i) the Court must vacate the Confessed Judgment wherever it has been entered; (ii) the Court must void the related documents included with the Agreement, including cancelling the UCC-1 financing statement; (iii) the Court must declare the Agreement an illegal loan and debt under New York law; (iv) the Court must enjoin the collection of the underlying debt arising from the Agreement, including (but not limited to) the Principal Amount on the Agreement and Guaranty; (v) the Court should require Defendant to turn over to the Debtor all amounts paid under the Agreement, in a minimum amount of $16,755.00, as property of the estate, plus penalties and attorney's fees; and (vi) the Court should declare Defendant adequately protected in the underlying Chapter 11 case due to its receipt of $16,755.00 in prepetition payments on a cash advance of $75,000.00, such that no further adequate protection payments are necessary so long as the lien has not been voided, "and declaring and determining that no adequate protection is required once the lien has been voided." Compl. ¶ 21.

Defendant seeks dismissal of Count I for usury under New York law for failing to state a claim upon which relief may be granted.  Defendant asserts that, to be liable for usury, the Agreement first has to be found to constitute a loan.  If the Agreement is not a loan, then under applicable New York law, it is not subject to the state's usury statute.  Citing to various New York state court cases involving merchant cash advance agreements similar to the one at issue here,

Defendant contends that the Agreement is not a loan, but rather an agreement to purchase the Debtor's future receivables, which may or may not ever be collected by the Debtor.

The Debtor, however, argues that the Agreement is a loan cloaked as a purchase of future receivables, especially in light of the "egregious" terms of the transaction.[9]  The Debtor contends that the Agreement contains several provisions which, when considered together, absolutely guarantee repayment of the Purchased Amount.  The Debtor argues that because Defendant incurs no risk of non-payment under the terms of the Agreement, the transaction constitutes a loan disguised as a sale of receivables. The Debtor points to the following language in the Agreement to support this proposition: "[Debtor] will conduct its business in good faith and will use its best efforts to continue its business at least at its current level, to ensure that [Defendant] obtains the Purchased Amount."  Agreement, Section 13.1.

The Debtor further seeks to have the Court find that the Agreement constitutes a loan based upon the Guaranty and an affidavit in support of the Confessed Judgment Ms. Dang was obligated to sign in connection with the transaction.[10]  The Debtor asserts that a guaranty is a factor considered by New York courts in determining whether a transaction is loan, and argues that the Guaranty Defendant utilized in the transaction operates to ensure repayment of the Purchased Amount.[11]  Moreover, the Debtor explains that prior to disbursing the Purchase Price, Defendant insisted Ms.

---

[9] The Debtor contends that Defendant attempted to recoup $111,750.00 (the Purchased Amount) on $75,000.00 (the Purchase Price) received by the Debtor, which equates to 49 percent interest on the Purchased Amount over 44 days. The Debtor asserts that such figures annualize to approximately 400% APR without including miscellaneous fees. Mot. Summ. J., p. 7, fn.5.

[10] This affidavit is attached the Dang Affidavit at page five (5).

[11] The Debtor specifically points to Provision 3 of the Guaranty to support its assertion that it ensures repayment of the Purchased Amount, which provides that Ms. Dang will not sell, convey, transfer, or otherwise dispose of  any material business assets of the Debtor, or cause the Debtor to do same, without the prior written consent of Defendant until the entire Purchased Amount is received by Defendant.

Dang execute the Confessed Judgment, further demonstrating an intent to ensure repayment of the Purchased Amount.

The default and remedies provisions of the Agreement, according to the Debtor, also eliminate Defendant's risk of non-payment. Specifically, the Debtor points to Section 15(j) of the Agreement, which states that the Debtor's failure to maintain at least twice the Daily Amount in its bank account during the Agreement constitutes an Event of Default, which would result in, *inter alia*: (i) the Purchased Amount becoming immediately due; (ii) the Specified Percentage changing to 100% of the Debtor's future receipts; and (iii) Defendant proceeding to collect the full Purchased Amount plus associated fees and charges. The Debtor asserts that because the Agreement requires it to have at least twice the Daily Amount in its account, Defendant cannot accurately assert that it bears the risk of non-payment. Rather, this provision ensures that Defendant will receive the full Purchased Amount, even if the Debtor's business slows down or ceases operations, as such occurrences will inevitably result in the Debtor's account having less than twice the applicable Daily Amount.

### a. Applicable Law

Both parties agree that New York law applies to this dispute and the Court's interpretation of the Agreement. UFS Mot., p. 3-4; Mot. Summ. J., p. 6, fn.4.[12] The laws of the state of New York prohibit both civil and criminal usury. *EMA Fin., LLC v. AIM Exploration, Inc.*, 2019 U.S. Dist. LEXIS 26141, at *14 (S.D.N.Y. Feb. 19, 2019). Corporations, however, cannot assert claims for civil usury. *Id.* at *15 (citing N.Y. Gen. Oblig. Law § 5-521(1)).

Corporations can, however, assert criminal usury as a defense. Pursuant to New York's criminal usury statute:

---

[12] Further, Section 20 of the Agreement provides that it shall be governed and construed pursuant to New York law. Agreement, p. 7.

> A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period.

N.Y. Penal Law § 190.40. Accordingly, New York's criminal usury statute prohibits a party from knowingly charging interest on a loan in excess of 25 percent per annum.

Corporations are also barred from asserting affirmative claims for criminal usury; rather, they are limited to asserting criminal usury only as a defense to repayment. *See* N.Y. Gen. Oblig. Law § 5–521(3)(creating an exception to subsection (1) by permitting corporations to "interpose[ ] a *defense* of criminal usury as described in section 190.40 of the penal law.")(emphasis added). Consequently, corporations are barred from seeking "affirmative monetary relief" under Section 190.40. *Zoo Holdings, LLC v. Clinton*, 11 Misc.3d 1051(A), 2006 WL 297730, at *4 (N.Y. Sup. Ct. Jan. 24, 2006) (". . . insofar as the complaint seeks affirmative monetary relief, plaintiff improperly attempts to use a shield created by the Legislature as a sword."). In *Zoo Holdings*, the corporate borrower sought a declaration that securities offerings were not transactions but were actually usurious loans, as well as related monetary relief. *Id.* The Court found that affirmative relief is not available to corporations; rather, the statutory exception created by GOL 5-521(3) to extend the reach of Section 190.40 to corporations only applies where criminal usury is used as an affirmative defense to an action seeking repayment of the underlying obligation. *Id.* at 4-5; *see also Colonial Funding Network, Inc. for TVT Capital, LLC v. Epazz, Inc.*, 252 F. Supp. 3d 274, 280 (S.D.N.Y. 2017), *citing Scantek Medical Inc. v. Sabella*, 582 F. Supp. 2d 472, 474 (S.D.N.Y. 2008) ("Although corporations like plaintiff can assert criminal usury as a defense, they cannot bring civil claims under the criminal statute."); *Wilkinson Floor Covering, Inc. v Cap Call, LLC*, 59 Misc. 3d 1226(A), 2018 WL 2293196, at *3 (N.Y. Sup. Ct. May 16, 2018)(noting that in civil actions, a

19

corporation is precluded from asserting a claim for usury); *K9 Bytes, Inc. v. Arch Capital Funding*, 56 Misc. 3d 807, 815 (N.Y. Sup. Ct. 2017)(explaining that "[i]t has long been settled in this state that criminal usury may only be asserted as a defense by a corporation, and never as a means to seek affirmative relief.").

Construing Count I and VI of the Complaint together, it appears that the Debtor is in part asserting the criminal usury claim as a defense to repayment of Defendant's claim filed in the underlying bankruptcy case.  Under Count VI of the Complaint, the Debtor preemptively objects to the claim of Defendant[13] on various grounds, including pursuant to 11 U.S.C. § 502(b)(1), which permits disallowance where a claim is unenforceable under applicable law.  Here, the Debtor seeks a determination that the Agreement is illegal and criminally usurious under New York law.  When construed as a whole, it is clear that the Debtor, by way of Counts I and VI, is raising the criminal usury claim in this Adversary Proceeding as a way to object to the allowance and payment of Defendant's claim in the bankruptcy case.  Accordingly, the Debtor's assertion of criminal usury, to the extent the Debtor utilizes such assertion as a defense to repayment of Defendant's claim, is procedurally proper under applicable New York law.[14]

To succeed on the defense of criminal usury, a loan or forbearance must exist.  Criminal usury does not apply to a purchase and sale of receivables:

> The rudimentary element of usury is the existence of a loan or forbearance of money.  If the transaction is not a loan, there can be no usury, however unconscionable the contract may be.
>
> When determining whether a transaction constitutes a usurious loan it must be considered in its totality and judged by its real character, rather than by the name,

---

[13] Defendant has filed a proof of claim in the underlying bankruptcy case at Claim No. 11.

[14] In addition to seeking to be absolved of repaying its obligations under the Agreement in Count I, the Debtor seeks various forms of affirmative relief that are procedurally improper and unavailable to the Debtor in this Adversary Proceeding.  Thus, the only portion of Count I addressed *infra* relates to the Debtor's defense to repayment on the grounds of criminal usury under applicable New York law.  All other requests for affirmative relief related to the claim of usury are denied.

color, or form which the parties have seen fit to give it. Whether a transaction constitutes a cover for usury is a question of fact.

In order for a transaction to constitute a loan, there must be a borrower and a lender; and it must appear that the real purpose of the transaction was, on the one side, to lend money at usurious interest reserved in some form by the contract and, on the other side, to borrow upon the usurious terms dictated by the lender.

*Colonial Funding Network, supra*, 252 F. Supp. 3d at 280-81 (internal citations and quotations omitted). To constitute a true loan, "it is essential to provide for repayment absolutely and at all events or that the principal in some way be secured as distinguished from being put in hazard." *K9 Bytes*, 56 Misc.3d at 816 (quoting *Rubenstein v. Small*, 273 App.Div. 102, 104, 75 N.Y.S.2d 483 (1st Dept. 1947)).

Under New York law, there is a presumption against finding an agreement usurious. *See Wilkinson Floor Covering*, 2018 WL 2293196, at *3. Accordingly, "claims of usury must be proven by clear and convincing evidence, a much higher standard than the usual preponderance." *K9 Bytes*, 56 Misc.3d at 816 (citing *Giventer v. Arnow*, 37 N.Y.2d 305, 309, 372 N.Y.S.2d 63, 333 N.E.2d 366 (1975)). When repayment on the underlying transaction is contingent, the agreement is valid even where it provides for a return greater than the applicable legal rate of interest. *IBIS Capital Group, LLC v. Four Paws Orlando, LLC*, 2017 N.Y. Misc. LEXIS 884, at *2, 2017 NY Slip Op 30477(U) (N.Y. Sup. Ct. March 16, 2017); *see also Colonial Funding Network*, 252 F. Supp. 3d at 281 (noting that unless the principal amount advanced is repayable absolutely, there can be no defense of usury).

The subject of merchant cash advance agreements and whether they constitute loans or sales of future receivables has been considered by a number of New York state courts. *See Rapid Capital Finance, LLC v. Natures Market Corp.*, 57 Misc.3d 979, 982 (N.Y. Sup. Ct. 2017)(collecting cases); *see also K9 Bytes*, 56 Misc.3d at 816 ("Many trial courts have examined [merchant cash advance]

21

agreements in the last several years, and have largely determined that most of them are not loans, but purchases of receivables.")(citing cases); *NY Capital Asset Corp. v. F & B Fuel Oil Co., Inc.*, 58 Misc.3d 1229(A), at *6 (N.Y. Sup. Ct. 2018)(". . . purchases and sales of future receivables and sales proceeds. . . are common commercial transactions expressly contemplated by the Uniform Commercial Code.").  Recent decisions evaluating whether merchant cash advance agreements are sales or loans cite to certain factors to determine whether the transaction provides for absolute or contingent repayment.  *See, e.g., IBIS Capital Group*, 2017 N.Y. Misc. LEXIS 884, at *6-11; *K9 Bytes*, 56 Misc.3d at 816-18; *NY Capital Asset Corp.*, 58 Misc.3d 1229(A), at *7-8.

The first factor is the existence of a reconciliation provision.  A reconciliation provision allows for adjustments of the daily withdrawal amounts based upon the seller's actual collection of future receivables:

> The reconciliation provisions allow the merchant to seek an adjustment of the amounts being taken out of its account based on its cash flow (or lack thereof). If a merchant is doing poorly, the merchant will pay less, and will receive a refund of anything taken by the company exceeding the specified percentage (which often can also be adjusted downward). If the merchant is doing well, it will pay more than the daily amount to reach the specified percentage.

*K9 Bytes*, 56 Misc.3d at 817.  Here, the Agreement contains a reconciliation provision in Section 2:

> The Initial Daily Amount is intended to represent the Specified Percentage of [Debtor's] daily Future Receipts.  For as long as no Event of Default has occurred, once each calendar month, [Debtor] may request that [Defendant] adjust the Daily Amount to more closely reflect the [Debtor's] actual Future Receipts times the Specified Percentage. . . No more often than once a month, [Defendant] may adjust the Daily Amount on a going-forward basis to more closely reflect the [Debtor's] actual Future Receipts times the Specified Percentage. . . After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.

Another factor that New York courts look for in determining whether an agreement is a loan is ". . .whether the [buyer] has any recourse should the merchant declare bankruptcy." *Id*. at 818. Here, the Agreement provides, in relevant part, that ". . . if the full Purchase Amount is never remitted because [Debtor's] business went bankrupt or otherwise ceased operations in the ordinary course of business, and [Debtor] has not breached this Agreement, [Debtor] would not owe anything to [Defendant] and would not be in breach of or default under this Agreement." Agreement, Section 4, p. 3. In addition, filing for bankruptcy is not listed as an Event of Default. Agreement, Section 15, p. 6.

A third factor considered in the loan versus sale of future receivables analysis is whether the transaction provides for a definite term. *NY Capital Asset Corp.*, 58 Misc.3d 1229(A), at *7. As to this factor, Section 4 begins with the following:

> [Debtor] is selling a portion of a future revenue stream to [Defendant] at a discount, not borrowing money from [Defendant]. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by [Defendant].

Agreement, Section 4, p. 3. The Agreement also purports to provide contingent collection on the Purchased Amount solely based upon the Debtor's collections of its future receivables.

Having considered the above-referenced factors in analyzing whether the Agreement constitutes a loan subject to criminal usury, the Court nevertheless finds that the Agreement is a loan under applicable New York law. In analyzing this question, those factors—though helpful in the analysis—are not determinative. The Court still must examine the actual substance rather than the form of the Agreement to determine its true nature. *See Colonial Funding Network, supra*, 252 F. Supp. 3d at 280-81 (internal citations and quotations omitted)("When determining whether a transaction constitutes a usurious loan it must be considered in its totality and judged by its real character, rather than by the name, color, or form which the parties have seen fit to give it."). The

ultimate touchstone of whether a transaction constitutes a loan is if it provides for guaranteed repayment. For the reasons set forth below, the Court finds that the Agreement provides for guaranteed repayment; accordingly, the existence of the three factors does not end the inquiry into the true substance of the Agreement.[15]

### b. The Agreement is a Usurious Loan under New York Law

Upon consideration of the substance of the transaction rather than its superficial form, the Agreement does not in fact subject Defendant to any risk that the Debtor will fail to make the required payments, despite certain language in the Agreement and Defendant's arguments to the contrary. In reality, the purported "risk of nonpayment" does not exist if the Agreement's "Events of Default" section—specifically the requirement that the Debtor have twice the Daily Amount in its account at all relevant times—is read in conjunction with the limits of the reconciliation provision.

Defendant repeatedly asserts that, under the Agreement, it bears the risk that there will be no Future Receipts and therefore no payment. Defendant is correct that the Agreement provides for that contingency on its face:

> If Future Receipts are remitted more slowly than [Defendant] may have anticipated or projected because [Debtor's] business has slowed down, or if the full Purchase Amount is never remitted because [Debtor's] business went bankrupt or otherwise ceased operations in the ordinary course of business, and [Debtor] has not breached this Agreement, [Debtor] would not owe anything to [Defendant] and would not be in breach of or default under this Agreement.

---

[15] The Debtor asserts that the existence of a guaranty and UCC-1 financing statement also support a finding that the Agreement constitutes a loan. However, recent cases analyzing merchant cash advance agreements have found that the existence of a guaranty and security interest in the seller's receivables do not automatically transform the transaction into a loan where enforcement of the guaranty and security interest is limited to default under the main agreement. *See*, e.g., *Rapid Capital Finance, LLC v. Natures Market Corp*., 57 Misc 3d 979, 984-85 (Sup. Ct., Westchester Cnty. 2017) (explaining that execution of a security interest, though it may serve to protect the buyer's ability to collect the underlying obligation, is insufficient alone to establish absolute repayment; *Platinum Rapid Funding Group Ltd. v. VIP Limousine Servs., Inc.*, 2016 N.Y. Misc. LEXIS 4131, at *9 (N.Y. Sup. Ct. Oct. 27, 2016)(finding contingent repayment where "[t]he guaranty is no broader than the obligations under the Agreement, and the requirement of payment by the Guarantor is no greater than that of the Merchant."); *NY Capital Asset Corp.*, *supra*, 58 Misc.3d 1229(A), at *7 (same).

Agreement, Section 4, p. 3.  Moreover, the reconciliation provision of Section 2 permits the Debtor to adjust the Daily Amount to more closely reflect its Future Receipts times the Specified Percentage.  If the Debtor is doing poorly, it can request a downward adjustment of the Daily Amount and pay less; if the Debtor is doing well, Defendant can request an upward adjustment of the Daily Amount and the Debtor will pay more.  The language of the reconciliation provision is consistent with the notion that the Debtor's repayment of the Purchased Amount is contingent on its future receivables.  Notably, both parties are only allowed to seek reconciliation once per month.

The purpose of the reconciliation provision and the notion that Defendant may never receive the Purchased Amount are counteracted by the Event of Default that requires twice the Daily Amount to be present in the Debtor's account at all times relevant to the Agreement.  Defendant contends (and the Agreement provides) that if Future Receipts are collected more slowly than anticipated because the Debtor's operations slow down, or if the full Purchased Amount is never received because the Debtor ceases operations in the ordinary course, then the Debtor would not owe anything to Defendant and would not be in breach of the Agreement.  However, these "representations" about the contingent nature of repayment are undercut by the fact that if the Debtor does not have twice the Daily Amount in its account at any time, it will be in default under the Agreement, and full unconditional liability will be triggered.

The underlying transaction is structured so that all of the uncertainty in repayment and all of the protections against pursuing the Debtor for nonpayment require that the Debtor not be in default under the Agreement.  *See* Agreement, Section 4 ("If Future Receipts are remitted more slowly than [Defendant] anticipated or projected because [Debtor's] business has slowed down, or if the full Purchased Amount is never remitted because [Debtor's] business went bankrupt or otherwise ceased operations in the ordinary course of business, *and* [*Debtor*] *has not breached this*

*Agreement*, [Debtor] would not owe anything to [Defendant] and would not be in breach of or default under this Agreement.")(emphasis added).

If the Debtor defaults under the Agreement, then the contingent nature of the Agreement is immediately replaced by guaranteed repayment of the Purchased Amount, plus attorneys' fees and related costs.  Upon default, the Daily Amount will equal 100 percent of all of the Debtor's Future Receipts and the full, uncollected Purchased Amount will be immediately due and payable in full. Further, the protections built into the Agreement designed to protect Defendant's interests in collecting the full Purchased Amount, such as the UCC-1 financing statement and related security interest, the Confessed Judgment, and the Guaranty, will be triggered.  Thus, if default by the Debtor is a certainty or near certainty, the provisions professing contingent repayment and protections for the Debtor if it files for bankruptcy or ceases/slows operations have no practical effect.  Here, the Agreement contains a certainty of default by requiring the Debtor to have twice the Daily Amount in its account at all times.  As a result, the Debtor was sure to default from the outset, and Defendant really bears no actual or appreciable risk that it will not receive repayment in full.

Requiring the Debtor to have twice the Daily Amount in its accounts every day during the duration of the Agreement assures default by the Debtor (and in turn, repayment of the Purchased Amount).  The Defendant "purchased" 17 percent of the Debtor's future receivables under the Agreement.  Requiring the Debtor to have twice the Daily Amount in its account would require it to maintain as cash the equivalent of at least 34 percent of its daily collections in its account. Assuming that half of that would be taken by Defendant in its daily debit, that would still require the Debtor to keep another 17% of its daily collections permanently unused in its checking account just to satisfy this requirement.  Satisfying such a requirement continually would be virtually impossible for any business.  Thus, this Event of Default is designed to ensure that the Debtor will

26

inevitably default under the Agreement, which in turn will guarantee repayment of the Purchased Amount by the Debtor.  Consequently, as the Agreement provides for absolute repayment, it thereby constitutes a loan subject to New York's criminal usury law.[16]

If it had responded to the Motion for Summary Judgment, Defendant might have argued that the reconciliation provision operates to ensure that failing to maintain twice the Daily Amount in its account will not result in default if the Debtor's cash flow slows or dries up entirely, as the Debtor has the ability to adjust the Daily Amount to more accurately reflect its Future Receipts if such a downturn in operations were to occur.  However, pursuant to the terms of the Agreement, the Debtor is limited to seeking reconciliation to once per month and cannot seek it if it is in default. Accordingly, if, in the midst of an operational downturn, the Debtor had previously sought reconciliation in the prior month, it would be foreclosed from obtaining a second reconciliation until the next month.  Further, if, like occurred here, nearly immediate default was inevitable, no reconciliation could ever be requested.  Thus, the existence of the reconciliation provision fails to make collection on the amounts owed under the Agreement in any way conditional or uncertain.[17]

Further, the language of the reconciliation provision is extremely vague in terms of its intended operation.  There is no time frame for how quickly a request for a reduction in the Daily Amount will be responded to, nor does the Agreement say expressly what the payment and bank

---

[16] This inevitability of default by the Debtor is borne out by its actual performance under the Agreement.  The Agreement was executed on October 3, 2018, with daily debits occurring every day thereafter.  The Confessed Judgment was obtained 44 days later, on November 16, 2018.  The Debtor asserts that it made $8,936.00 in payments under the Agreement, plus an additional $7,819.00 in payments.  With daily debits of $1,117.00, it appears that the Debtor was only able to withstand eight (8) days of debits by Defendant before it defaulted under the Agreement by, according to Defendant, switching bank accounts, and made a total of only fifteen (15) payments of the Daily Amount.

[17] This assumes further that the Debtor's inability to maintain the required balance would have to result from a business downturn, as opposed to the fact that the Debtor simply could not afford for the next five (5) months (the time it would take for the Purchased Amount to be paid in full at the initially agreed upon Daily Amount) to pay 17% of its collections to Defendant to repay this obligation, keep another 17% inert in its checking account, and still pay its other operational expenses so as to stay in business.  If this simple inability to perform was the cause of the Debtor's default, as opposed to a business downturn, then no adjustment would be permitted even under the terms of the reconciliation provision.

balance obligations of the Debtor are while the request is being processed (based upon the plain language of the Agreement, which states that reconciliation changes the amounts "going forward," and that the new amounts apply "after each adjustment," it appears that they remain at the old rate until changed). There is certainly no indication in the Agreement that if a change is approved pursuant to the reconciliation provision that it is retroactive to the date of the request. In fact, the language of the reconciliation provision appears to provide that if the Debtor fails to maintain the appropriate balance in its account until the new Daily Amount is approved, the Debtor will be in default under the Agreement and Defendant will no longer be obligated to consider the reconciliation request.

Because the Debtor is required to have at least twice the Daily Amount in its account at all times under the Agreement, Defendant's collection of the Purchased Amount is not wholly contingent on Debtor's collection of its future receivables. Instead, default is virtually assured by the structure of the Agreement, and once default occurs, all the provisions that make the obligation to pay the Purchased Amount in full under the Agreement contingent are swept away, and the Agreement is nothing more than a loan. Further, in the absence of those protections, and because immediate default is a near certainty (as is borne out by the Debtor's actual performance), the Agreement does not have an indefinite term that precludes the calculation of a rate of interest; rather, the Court can calculate a rate of interest under the Agreement based on the daily debits of the Daily Amount until the full Purchased Amount is collected.[18]  The Agreement provides for an advanced

---

[18] This method of calculation is the most beneficial to Defendant because it spreads the fixed amount of interest being charged ($36,750.00, or the Purchased Amount minus Purchase Price) over the longest period available to Defendant in light of the certainty of default by the Debtor. By contrast, the Debtor encourages the Court to calculate the interest rate based on the number of days from the advance of the Purchase Price to the entry of the Confessed Judgment (44 days). Mot. Summ. J., p. 7, fn.5. Defendant did not either admit that the Agreement is usurious if found to be a loan or provide the Court with an alternative method of calculation that shows how it is not usurious because it did not address that possibility in the UFS Motion, and it declined to respond at all to the Motion for Summary Judgment and the Statement of Material Facts.

principal amount (the Purchase Price) of $75,000.00 in exchange for a repayment price of $111,750.00 (the Purchased Amount) to be made by daily debits in the amount of $1,117.00 (the Daily Amount) until the full Purchased Amount is collected.  Based upon this payment schedule, Defendant would receive the Purchased Amount within approximately 150 days (101 business days on which payments could occur).  Such a payment structure results in interest accruing at approximately 115 percent per annum, which far exceeds the 25 percent annual threshold for criminal usury under New York law.

### c. Further Briefing Required to Determine Appropriate Remedy

Having found that the Agreement constitutes a criminally usurious loan under applicable New York law, the Court must then determine the appropriate remedy.  The Debtor argues in its Motion for Summary Judgment that once the Agreement is found to be a usurious loan, the applicable remedy under New York law is for: (i) the Agreement to be declared void *ab initio*; (ii) all funds paid by the Debtor to Defendant to be returned to the Debtor; (iii) Defendant's proof of claim, filed in the claims docket in the underlying bankruptcy case as Claim No. 11, to be disallowed; and (iv) the Confessed Judgment to be deemed null and void and set aside.  The only legal support cited by the Debtor for the relief it seeks is a citation to *Merchant Funding Servs., LLC v. Volunteer Pharm. Inc.*, 55 Misc. 3d 316, 320 (N.Y. Sup. Ct. Dec. 30, 2016) for the following quote: "[i]f usury is proved, the loan is deemed void, and the lender sacrifices his principal and interest."  Notably, that quote from *Merchant Funding* is taken from *In re Venture Mtge. Fund, L.P.*, 245 BR 460, 473-74 (Bankr. S.D.N.Y. 2000), which was appealed to the Second Circuit Court of Appeals in *Brodie v. Schmutz* (*In re Venture Mort. Fund, L.P.*), 282 F.3d 185 (2d Cir. 2002).  In *Brodie*, the Second Circuit opined in dicta whether a loan found to be criminally usurious under N.Y. Penal Law § 190.40 is automatically void, ultimately stating that ". . . it is an open question

under New York law whether a criminally usurious loan is void." *Brodie*, 282 F.3d at 190-91.  The *Brodie* court noted that, although New York's civil usury statute provides a mechanism to void a loan under N.Y. Gen Oblig. Law § 5-511, the text of the criminal usury statute fails to provide for a remedy.  *Id*. at 190, fn.4.

Moreover, recent New York decisions acknowledge the existence of the open question regarding the permissible remedy upon finding a loan criminally usurious.  *See, e.g. EMA Fin., LLC v. AIM Exploration, Inc*., 2019 U.S. Dist. LEXIS 26141, at *16 (S.D.N.Y. Feb. 19, 2019)("... while Defendants argue that a finding of criminal usury in this case would render the Note and accompanying agreements void *ab initio*, there is no specific statutory authority for voiding a loan that violates the criminal usury statute only."); *Adar Bays, LLC v. GeneSys ID, Inc.*, 341 F. Supp. 3d 339, 352 (S.D.N.Y. 2018)(explaining that criminally usurious loans are not automatically declared void, ". . . as numerous courts have recognized, there is no specific statutory authority for voiding a loan that violates the criminal usury statute.")(internal citation and quotation omitted).  It appears that New York courts, when faced with a criminally usurious loan, have fashioned a variety of remedies.  *See EMA*, *supra*, 2019 U.S. Dist. LEXIS 26141, at *16-17 (citing cases which, upon finding a loan to be criminally usurious, either (i) declared the loan void; or (ii) did not void the loan *ab initio*, but revised the agreement to provide for a non-usurious interest rate).

Accordingly, the parties are directed *infra* to provide supplemental briefing as to the proper remedy to address the finding that the Agreement violates N.Y. Penal Law § 190.40 and is criminally usurious.

### III. Count II (Unjust Enrichment)

In Count II of the Complaint, the Debtor asserts a claim for unjust enrichment.  The Debtor contends that "[t]here is a lack of adequate remedy under the law" and that "Defendant financially benefited" at the Debtor's expense under the Agreement. Compl. at ¶¶ 23-24.  The Debtor seeks restitution in the amount of "at least $16,755.00" plus damages cause by the loss of business to the Debtor.  *Id.* at ¶ 24.  Nowhere in the Complaint does the Debtor cite to any applicable statute or case law to support this Count.  The Debtor does not move summary judgment as to this Count in the Motion for Summary Judgment.

In the UFS Motion, Defendant simply says the following regarding Count II: "GMI received $75,000.00 from Unique.  GMI paid Unique $16,755.00.  Unique is out $58,245.00.  There is no unjust enrichment, except by GMI."  UFS Mot., p. 6 (internal citations omitted).

As both parties assert that New York law applies to the Agreement, and the Agreement so provides, Count II for unjust enrichment will be analyzed under applicable New York law.[19]  To recover for unjust enrichment under New York law, the moving party must show that: "(1) the defendant was enriched; (2) the enrichment was at the plaintiff's expense; and (3) equity and good conscience require restitution."  *In re Moyer Group, Inc.*, 586 B.R. 401, 408 (Bankr. S.D.N.Y. 2018); *see also In re Chin*, 492 B.R. 117, 125-26 (Bankr. E.D.N.Y. 2013) ("[T]o prove an unjust enrichment claim more is required than simply showing that one party received a benefit, that the enrichment must be such that in equity and good conscience its retention would be unjust, and to determine whether there has indeed been unjust enrichment the inquiry must focus on the human setting involved, not merely upon the transaction in isolation.")(internal citation and quotation

---

[19] The Debtor also asserts in Count VII that New York law applies to its unconscionability claim.

omitted).  Typically, a claim for unjust enrichment—which is itself a quasi-contract claim—arises only in the absence of a valid and enforceable contract.  *See Moyer Group*, 586 B.R. at 408.

Even in light of the findings *supra* regarding the existence of a criminally usurious loan, the Debtor has failed to sufficiently allege a claim for unjust enrichment under New York law.  Here, the Agreement has been found to be criminally usurious.  As a result, the agreement will either be declared void in its entirety, or some other remedy will be provided.  To the extent the Agreement is found void as a result of the criminal usury finding, it is still not clear that the Debtor states a valid claim for unjust enrichment.  Even if the Agreement is found to be void, the Debtor cannot show that Defendant was unjustly enriched at the Debtor's expense by making a loan to the Debtor at a usurious rate of interest.  Rather, the facts show that the Debtor received $75,000.00 and only paid Defendant $16,755.00.  Accordingly, even if the Agreement is void and the proper remedy is to declare it entirely void, it is not true that "equity and good conscience" would require restitution in the amount of $16,755.00.  For those reasons, the UFS Motion is granted as to Count II.

## IV. Count III (Avoidance & Recovery of Preferential Transfers)

Plaintiff alleges in Count III of the Complaint two types of preferential transfers arising from the Agreement pursuant to 11 U.S.C. § 547(b).  The first type relates to certain payments by check, cash, wire transfer, or otherwise (the "Payment Transfers") made by the Debtor for the benefit of Defendant within the 90-day period preceding the Petition Date.  The second type is based upon the Confessed Judgment (the "Judgment Transfer").  According to the Debtor's assertions in both the Complaint and the Motion for Summary Judgment, entry of the Confessed Judgment (which occurred on November 16, 2018—exactly 90 days prior to the Petition Date) constitutes a preferential transfer subject to avoidance pursuant to 11 U.S.C. § 547(b).  The Debtor further seeks recovery of the Payment Transfers and Judgment Transfer, to the extent they are

avoided herein, pursuant to 11 U.S.C. § 550. Although Count III seeks to avoid two types of preferences, the Debtor only seeks summary judgment in the Motion for Summary Judgment as to the Judgment Transfer.

Outside of reciting the elements of Section 547(b) for finding a preferential transfer, the Debtor cites to no law in support of its assertion that the Confessed Judgment constitutes a transfer subject to avoidance under Section 547 in either the Complaint or the Motion for Summary Judgment. Instead, the Debtor asserts that the Confessed Judgment was obtained within 90 days of the Petition Date; it was for Defendant's benefit; it was obtained on account of an antecedent debt owed by the Debtor to Defendant while the Debtor was presumed insolvent under 11 U.S.C. § 547(f); and it enabled Defendant to recover more than it would absent the existence of the Confessed Judgment.

Defendant asserts the following as to Count III: "Unique received no payments in the 90 days preceding the bankruptcy and therefore there are no preference payments to recover." UFS Mot., p. 7. The UFS Motion does not distinguish between the Payment Transfers and Judgment Transfer, but rather asserts only that no payments were made in the 90-day period preceding the Petition Date.

For the reasons set forth below, the UFS Motion as to Count III is granted as to the Judgment Transfer and the Payment Transfers, and the Motion for Summary Judgment is denied as to Count III.

Section 547(b) provides:

> (b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property–
>
> > (1) to or for the benefit of a creditor;
> >
> > (2) for or on account of an antecedent debt owed by the debtor before such

transfer was made;

(3) made while the debtor was insolvent;

(4) made–

    (A) on or within 90 days before the date of the filing of the petition; or

    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if–

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer has not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

As to the Payment Transfers, the Complaint fails to identify any payments made by the Debtor for the benefit of Defendant within the 90-day preference period. Instead, the Debtor asserts generally that "[d]uring the 90-day period prior to the Petition Date . . . , Debtor may have made one or more transfers by check, cash, wire transfer, or its equivalent, or otherwise, directly to or for the benefit of the Defendant . . . These payments include monies that Defendant sought to garnish from GMI's customers and GMI is seeking further information and the recovery of all such transfers." Compl., ¶ 28. Nowhere in the Complaint does the Debtor identify the Payment Transfers; similarly, none of the pleadings filed in support of the Motion for Summary Judgment provide any evidence or details about the existence, timing, nature, or amount of any Payment Transfers. A threshold issue for the Debtor's preference claim as to the Payment Transfers is the existence of such transfers—that the Debtor did in fact make "transfer[s] of an interest of the debtor

in property. . .".  11 U.S.C. § 547(b).  And here, when faced with a motion to dismiss, the Debtor

has failed to plead a plausible claim under 11 U.S.C. § 547(b) by failing to include any facts

sufficient to determine the existence of the Payment Transfers, much less whether they were made

for the benefit of the Defendant, within the 90-day preference period, while the Debtor was

insolvent, and that enabled Defendant to receive more than it would in a hypothetical Chapter 7

case had the transfers not been made.  Thus, the Complaint fails to state a claim for avoidable

preferences under Section 547(b) as to the Payment Transfers, and the UFS Motion is granted as to

the Payment Transfers asserted in Count III.  The Debtor is, however, provided 30 days from the

date of entry of this Order to amend the Complaint to identify the Payment Transfers with

specificity.

     The Complaint is also deficient as to the Judgment Transfer.  As a prerequisite to an

avoidance action under Section 547(b), there must be a *"transfer* of an interest of the debtor in

property. . ."  11 U.S.C. § 547(b)(emphasis added).  The Debtor makes the conclusory statement

without any legal support in both the Complaint and the Motion for Summary Judgment that entry

of the Confessed Judgment is a "transfer" subject to avoidance under Section 547(b).  A "transfer"

is defined under 11 U.S.C. § 101(54) as:

       (A) the creation of a lien;

       (B) the retention of title as a security interest;

       (C) the foreclosure of a debtor's equity of redemption; or

       (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with--

         (i) property; or

         (ii) an interest in property.

11 U.S.C. § 101(54).  Here, it is not clear to the Court, and the Debtor has not demonstrated, how

the entry of the Confessed Judgment constitutes a "transfer" as defined in Section 101(54) and used

in Section 547(b).

Implicit in the Debtor's assertion that entry of the Confessed Judgment constitutes a transfer

may be the assumption that the entry of the Confessed Judgment created a lien in property of the

Debtor.  However, it is not clear that entry of the Confessed Judgment created a lien in any property

of the Debtor.  First, the Debtor has not disclosed in any of the pleadings filed in this Adversary

Proceeding any property it owns or in which it maintains an interest that is located in New York

and that would be subject to the Confessed Judgment.  Rather, the Debtor is a Georgia corporation

with operations in the Southeast, predominantly Georgia and Florida.  *See* Compl., ¶ 7.

To the extent the Debtor does have personal property interests[20] in New York, a judgment

entered in New York does not automatically constitute a lien against property of the judgment

debtor, except as provided by statute.  *In re Pandeff*, 201 B.R. 865, 873 (Bankr. S.D.N.Y. 1996).

Section 5202 of New York's Civil Practice Law and Rules governs the creation of judgment liens

on personal property and provides:

(a) Execution creditor's rights. Where a judgment creditor has delivered an execution to a sheriff, the judgment creditor's rights in a debt owed to the judgment debtor or in an interest of the judgment debtor in personal property, against which debt or property the judgment may be enforced, are superior to the extent of the amount of the execution to the rights of any transferee of the debt or property, except:

1. a transferee who acquired the debt or property for fair consideration before it was levied upon; or

2. a transferee who acquired a debt or personal property not capable of delivery for fair consideration after it was levied upon without knowledge of the levy.

---

[20] According to the Debtor's Schedule A/B filed in the bankruptcy case (Main Bankruptcy Case, Docket No. 29, p. 7), the Debtor does not own or lease any real property.  Thus, the analysis is limited to personal property.

> (b) Other judgment creditor's rights. Where a judgment creditor has secured an order for delivery of, payment of, or appointment of a receiver of, a debt owed to the judgment debtor or an interest of the judgment debtor in personal property, the judgment creditor's rights in the debt or property are superior to the rights of any transferee of the debt or property, except a transferee who acquired the debt or property for fair consideration and without notice of such order.

Thus, to create a judgment lien on personal property in New York, "the judgment creditor must either 'execute' on the judgment or obtain an enforcement order." *Pandeff*, 201 B.R. at 874 (citing *Balaber–Strauss v. Marine Midland Bank*, 129 B.R. 369 (Bankr. S.D.N.Y. 1991)). Neither party has plead any facts that Defendant has executed on the Confessed Judgment or obtained an enforcement order. Accordingly, entry of the Confessed Judgment has not created a lien in the Debtor's personal property in New York, and thus does not constitute a "transfer" for the purposes of Section 547(b).

The Confessed Judgment has also not created a lien in the Debtor's property located in Georgia. In Georgia, a judgment lien is created in personal property on the date of rendition of the judgment. 5 Ga. Proc. Verdict and Judgments § 9:11 (2019) (citing cases); *see also* O.C.G.A. § 9-12-80 ("All judgments obtained in the superior courts, magistrate courts, or other courts of this state shall be of equal dignity and shall bind all the property of the defendant in judgment, both real and personal, from the date of such judgments except as otherwise provided in this Code."). However, prior to being enforced in Georgia, the Confessed Judgment must first be domesticated pursuant to Georgia's Uniform Enforcement of Foreign Judgments Law (the "UEFJL"), O.C.G.A. § 9-12-130 *et. seq.* No evidence has been provided that Defendant domesticated the Confessed Judgment as to the Debtor pursuant to Georgia's UEFJL prior to the filing of the instant bankruptcy case.[21]

---

[21] Defendant attempted to domesticate the Confessed Judgment against Ms. Dang early into this case. Such action, among other collection activities against Ms. Dang, was temporarily enjoined pursuant to an *Order Granting Injunction* (Docket No. 17) entered on April 24, 2019.

In light of the foregoing, it does not appear that entry of the Confessed Judgment constitutes a "transfer" as defined in 11 U.S.C. § 101(54) which could be subject to avoidance under 11 U.S.C. § 547(b).[22]  Accordingly, the Complaint fails to state a claim for an avoidable preference in Count III as to the Judgment Transfer.  Thus, the UFS Motion as to the Judgment Transfer is granted and the Debtor's Motion for Summary Judgment as to Count III for the Judgment Transfer is denied. The Debtor is, however, provided 30 days from the date of entry of this Order to amend the Complaint to include facts that would show the existence of a transfer under 11 U.S.C. § 547(b) as to the Judgment Transfer.

**V. Count IV (Avoidance & Recovery of Fraudulent Transfers)**

In Count IV of the Complaint, the Debtor seeks to avoid and recover certain transfers made to Defendant pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550.  In the UFS Motion, Defendant asserts that the Debtor cannot bring a fraudulent transfer claim based upon the doctrine of unclean hands. However, 11 U.S.C. § 1107(a) empowers a debtor-in-possession with the same rights, powers, and duties as a trustee, including pursuing Section 548 fraudulent transfer actions.

Pursuant to Section 548(a)(1)(B), a debtor-in-possession may avoid a transfer that occurred within two (2) years of the petition date if the debtor voluntarily or involuntarily:

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

>> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

>> (II) was engaged in business or a transaction, or was about to engage in

---

[22] It is also not clear how, in light of the security interest provided for in the Agreement and the UCC-1 financing statement, Section 547(b)(5) would be satisfied, unless the voiding of the Agreement also renders the security interest ineffective, which is the subject of Count V addressed below.

business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

The Debtor asserts that it transferred to Defendant funds totaling $16,755.00 within two (2) years of the Petition Date (beginning in October 2018 at the inception of the Agreement) during which time the Debtor was insolvent or intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay such debts as they matured.[23]   The Debtor does not, however, assert in the Complaint any facts that go to the "reasonably equivalent value" element to show that it received less than reasonably equivalent value for the $16,755.00 in transferred funds. Reasonably equivalent value is analyzed through a three-part test: "(i) whether the debtor received value; (ii) whether the value received was in exchange for the property transferred; and (iii) whether the value was reasonably equivalent to the value of the property transferred."  *In re Knight*, 473 B.R. 847, 850 (Bankr. N.D. Ga. 2012)(citing *Pummill v. Greensfelder, Hemker & Gale* (*In re Richards & Conover Steel, Co.*) 267 B.R. 602, 612 (8th Cir. BAP 2001)).

Here, the facts of the Complaint are that the Debtor received $75,000.00 from Defendant pursuant to the Agreement and the Debtor has paid Defendant $16,755.00.  Whether or not the

---

[23] The Debtor also attempts to assert that the unidentified allegedly preferential transfers outlined in Count III also constitute fraudulent transfers subject to avoidance under Section 548 in Count IV. Compl., ¶ 39.  For the reasons set forth *supra*, the Debtor failed to identify any "transfers" as to Count III subject to avoidance under 11 U.S.C. § 547, both as to the Payment Transfers and Judgment Transfer.  Consequently, the inadequately identified Payment Transfers and Judgment Transfer asserted in Count III cannot form the basis of the Debtor's fraudulent transfer claim in Count IV.  The analysis of Count IV is therefore limited to the only transfer identified in that count: the $16,755.00 in payments made by the Debtor to Defendant under the Agreement.

Agreement is valid, it appears that the Debtor received reasonably equivalent value for the $16,755.00 transferred to Defendant—the $75,000.00 received from Defendant in exchange. Thus, the Debtor has failed to show that it received less than reasonably equivalent value under Section 548(a)(1)(B)(ii)(I).

The Debtor also includes in Count IV mention of fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A),[24] which permits avoidance of transfers of an interest of the Debtor in property made within two (2) years of the Petition Date with the actual intent to hinder, delay, or defraud the creditors. However, Count IV is titled "Avoidance and Recovery of Fraudulent Transfers (Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550)." Further, the last paragraph of Count IV only seeks to avoid transfers enumerated in that section pursuant to Sections 548(a)(1)(B) and 550. Thus, it does not appear that the Debtor actually intends to seek avoidance under the actual fraud theory of 11 U.S.C. § 548(a)(1)(A) in Count IV. However, to the extent the Debtor does seek avoidance on an actual fraud theory under Section 548(a)(1)(A), the Complaint fails to state such a claim under the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *In re Medici*, 524 B.R. 902, 905 (Bankr. N.D. Ga. 2014). Rule 9(b) is satisfied where the complaint "alerts the defendant to the precise misconduct with which they are charged." *Id*. (internal citation and quotations omitted). Although direct proof of an actual intent to hinder, delay, or defraud creditors is not required, a plaintiff "may plead circumstantial evidence from which the court may infer intent." *In re Siskey Hauling Co., Inc.*, 2011 WL 1519969, at *3 (Bankr. N.D. Ga. Jan. 6, 2011). In the Eleventh Circuit, circumstantial evidence upon which courts may infer actual fraudulent intent are known as "badges of fraud," and include the following:

---

[24] Section 548(a)(1)(A) provides that the "trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—(A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was ... indebted[.]"

1) The transfer was to an insider;

2) The debtor retained possession or control of the property transferred after the transfer;

3) The transfer was disclosed or concealed;

4) Before the transfer was made the debtor had been sued or threatened with suit;

5) The transfer was of substantially all the debtor's assets;

6) The debtor absconded;

7) The debtor removed or concealed assets;

8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

9) The debtor was insolvent or became insolvent shortly after the transfer was made;

10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* (citing *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998)).  In assessing the badges of fraud and whether sufficient circumstances exist to infer actual intent, "[s]howing only one badge of fraud may be insufficient to establish intent, but a confluence of several can constitute conclusive evidence of an actual intent to defraud."  *In re White*, 559 B.R. 787, 806 (Bankr. N.D. Ga. 2016)(quoting *In re LendXFinancial, LLC*, 2012 WL 1597394, at *5 (Bankr. N.D. Ga. March 19, 2012))(internal quotation omitted).

As to the fraudulent transfer identified in the Complaint under Count IV (the $16,755.00 paid by the Debtor to Defendant under the Agreement), the only applicable badges of fraud that have been pled by the Debtor are the reasonably equivalent value (as explained *supra*) and insolvency badges.  These badges alone, however, fail to rise to the level of actual fraud.  The

totality of the circumstances surrounding the $16,755.00 in transferred funds fall short of providing a basis upon which the Court can infer that that the Debtor intended to hinder, delay, and defraud its other creditors in making the transfer.

Accordingly, as the Complaint fails to state a plausible claim under 11 U.S.C. §§ 548(a)(1)(A) or (B), the UFS Motion is granted as to Count IV.

## VI. Count V (Claim to Determine Validity, Priority, or Extent of Security Interests)

In Count V of the Complaint, the Debtor seeks a declaration that Defendant has no security interest in property of the Debtor by virtue of the Confessed Judgment or the UCC-1 financing statement because the underlying Agreement is criminally usurious and void *ab initio*.  The Debtor contends that upon the Agreement being declared void *ab initio*, there is no debt upon which Defendant's security interest or Confessed Judgment can attach, resulting Defendant having a secured claim in the amount of $0.00.

Defendant asserts, as to Count V, that because the Agreement is not a loan and therefore not subject to criminal usury law, and because Defendant has a perfected security interest in the Debtor's receivables by virtue the UCC-1 financing statement included with the Complaint, there is no basis for the Court to determine that Defendant is not secured.

In light of the findings set forth *supra* as to Count I that the Agreement is a loan and criminally usurious, the Complaint does state a plausible claim for determining the validity, priority, or extend of Defendant's security interest that relates to the Agreement.  Although the precise remedy for finding the Agreement criminally usurious is still outstanding and will require supplemental briefing by the parties, a potential result from the usury determination may affect the validity, priority, or extent of Defendant's security interest.  Thus, the Complaint sets forth a plausible claim for relief in Count V and the UFS Motion as to Count V is denied.

## VII. Count VI (Claims Issues)

In Count VI of the Complaint, the Debtor preemptively objects to the claim of Defendant in this case that arises by virtue of the Agreement. The Debtor seeks disallowance of Defendant's claim on various grounds, including that the Agreement is unenforceable under applicable New York law because it is a criminally usurious loan.[25]

Defendant asserts in the UFS Motion that that Count VI should be dismissed because: (i) the claim is moot as it has not filed a proof of claim in the underlying bankruptcy case;[26] and (ii) there are no avoidable preferential transfers under Section 547(b) and the Agreement is not a loan under applicable law and is therefore not usurious.

Similar to Count V, the allegations in Count VI relate to the validity and enforceability of the Agreement under applicable New York law. The Agreement has been found *supra* to constitute a usurious loan under applicable New York law. Under 11 U.S.C. § 502(b)(1), a claim may be disallowed where it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured[.]" Accordingly, the Debtor sets forth a plausible basis for objecting to Defendant's claim and seeking its disallowance on the ground that the underlying Agreement is criminally usurious. For that reason, the UFS Motion is denied as to Count VI.

---

[25] The Debtor also seeks disallowance of Defendant's claim on the grounds that Defendant is a transferee of an avoidable transfer under 11 U.S.C. § 547 and that Defendant is an entity from which property is recoverable pursuant to 11 U.S.C. § 553. The Section 547 claims are dismissed for the reasons set forth *supra*, with leave to replead. The Section 553 claim is not otherwise referenced in the Complaint, and is therefore inadequately supported and thus also dismissed.

[26] Defendant filed a proof of claim in the underlying bankruptcy case, Claim No. 11, on March 13, 2019. In it, Defendant asserts a fully secured claim in the amount of $136,967.60. The only evidence provided to support the proof of claim is a copy of the Confessed Judgment.

## VIII. Count VII (Unconscionability)

The Debtor asserts in Count VII that the Agreement and related documents (the Guaranty and UCC-1 financing statement) are together procedurally and substantively unconscionable under N.Y. Uniform Commercial Code § 2-302[27] and therefore should not be enforced against the Debtor.

Defendant asserts that the Debtor has failed to set forth any law or facts to support a claim for unconscionability; instead, Defendant contends that the facts demonstrate that the Debtor acted in bad faith in connection with the Agreement. Defendant states that the Debtor has alleged that it was insolvent when it sold its future receivables to Defendant, and that the Debtor immediately switched bank accounts after executing the Agreement.[28]

An unconscionable contract is found under New York law when it "is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *In re Residential Capital, LLC*, 531 B.R. 25, 48 (Bankr. S.D.N.Y. 2015) (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988))(internal quotations omitted). Proof that a contract is unconscionable requires satisfaction of two elements: procedural and substantive unconscionability. *In re BH Sutton Mezz LLC*, 2016 WL 8352445, at *11 (Bankr. S.D.N.Y. Dec. 1, 2016). Procedural and substantive unconscionability are defined as follows:

---

[27] N.Y. UCC 2-302 provides:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

[28] Defendant also makes an unsupported and unrelated assertion that Ms. Dang "fraudulently transferred [her] home to a trust" and that she and the Debtor are "the unconscionable actors." UFS Mot., p. 8.

Procedural unconscionability arises when there was a lack of meaningful choice arising from the contract formation process, in light of the circumstances of the transaction and the sophistication and bargaining power of the parties.

In determining if a provision is substantively unconscionable, a court must examine the substance of the bargain to determine whether the terms were unreasonably favorable to one party in light of their commercial context, their purpose, and their effect.

*Id.* (internal citation and quotation omitted).

Satisfaction of both elements, however, is not always necessary; in "'exceptional cases' courts have found that 'a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone.'" *Residential Capital*, 531 B.R. at 49 (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 12, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988)).

In addition, commercial contracts between businesses are generally presumed to be conscionable. *BH Sutton*, 2016 WL 8352445, at *12 (explaining that "[w]hen the contract is between two commercial entities, unconscionability must be viewed in light of the general commercial background and the commercial needs of the particular trade or case, and there is a presumption of conscionability when the contract is between business in a commercial setting. Courts have rarely found a clause to be unconscionable in a commercial contract.") (internal citation and quotation omitted).

Upon review of the facts asserted in the Complaint, it does not appear that the Debtor can sufficiently plead both substantive and procedural unconscionability.  Further, under New York law, the Agreement is presumed to be conscionable because it was executed by two commercial parties.  Thus, the Debtor has to overcome the presumption that the Agreement is conscionable.

Here, the facts fail to indicate procedural unconscionability in the formation process of the Agreement or a lack of meaningful choice on behalf of the Debtor.  The Debtor has not alleged that

deceptive or high-pressure tactics were used by Defendant in obtaining the Agreement, or that the Debtor lacked sufficient experience and commercial sophistication as compared to Defendant.[29]

The facts do, however, appear sufficient to satisfy the substantive unconscionability element, especially in light of the fact that the Agreement has been found to constitute a criminally usurious loan under New York law. Certainly a loan that violates a criminal usury statute constitutes an agreement with terms "unreasonably favorable" to Defendant sufficient to satisfy the requirement of substantive unconscionability. *Residential Capital*, 531 B.R. at 49.

The question then becomes whether, notwithstanding the fact that Debtor has demonstrated one prong of the unconscionability doctrine, the Debtor's unconscionability count can survive dismissal sought by the UFS Motion. Findings of unconscionability based only upon substantive unconscionability are "exceptional" and only found where the contract is so outrageous that substantive unconscionability alone is sufficient to warrant finding the contract unenforceable. *Residential Capital*, 531 B.R. at 49. Although the Agreement has been found to be a usurious loan, such a finding alone is not so exceptional and outrageous to support a finding of unconscionability based solely upon substantive unconscionability. As noted *supra*, the primary reason the Agreement was found to constitute a loan was because of a certain Event of Default requiring the Debtor to maintain twice the Daily Amount in its account, which effectively guaranteed repayment of the Purchased Amount. Had that requirement not been present in the Agreement, it might have constituted a valid sale of future receivables under applicable law. Thus, the finding that the Agreement is a loan and therefore criminally usurious alone is insufficient to support finding the Agreement unenforceable based upon the presence of a single element of unconscionability.

---

[29] Section 13.12 of the Agreement, entitled "Seller's Knowledge and Representation," provides that the Debtor "represents warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement" and that "it was represented by counsel or had full opportunity to consult with counsel." Agreement at p. 5.

Accordingly, the Complaint fails to sufficiently state a claim for unconscionability in Count VII. The UFS Motion is therefore granted as to Count VII.

## **CONCLUSION**

Upon consideration of the Complaint, UFS Motion, Motion for Summary Judgment, and other pleadings filed in this Adversary Proceeding, it is hereby

**ORDERED** that the UFS Motion is **GRANTED IN PART** and **DENIED IN PART** as follows:

The UFS Motion is granted as to Count II, Count III, Count IV, and Count VII. The Motion is denied as to Count I, Count V, and Count VI. And it is further

**ORDERED** that the Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART** as follows:

The Motion for Summary Judgment is granted in part as to Count I to the extent the Debtor seeks to defend against repayment of the underlying obligation. The Motion for Summary Judgment is denied as to Count III. And it is further

**ORDERED** that the Debtor shall have **30 days** from the date of entry of this Order to amend the Complaint as to Count III as provided *supra*. And it is further

**ORDERED** that the parties are directed to file supplemental pleadings regarding the appropriate remedy for a criminally usurious loan under New York law (as explained *supra* in Section II, subsection c) on or before **September 23, 2019**. Any responses to such briefs shall be filed on or before **October 7, 2019**.

The Clerk is directed to serve a copy of this Order upon the Debtor, counsel for the Debtor, Defendant, and counsel for Defendant.

## **[END OF DOCUMENT]**